IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 5, 2021 Session

FILED
06/24/2021
Clerk of the
Appellate Courts

# IN RE EVELLA S. ET AL.

**Appeal from the Chancery Court for Warren County**
**No. 696-A    Larry B. Stanley, Jr., Judge**

_____

## No. M2019-02075-COA-R3-PT

_____

Grandparents sought to terminate the parental rights of a mother and a father to their two children on the statutory ground of abandonment.  The trial court found clear and convincing evidence that Mother had abandoned the children by failure to visit or support them during the four months preceding the filing of the termination petition.  The court also found clear and convincing evidence that Father had abandoned the children by exhibiting wanton disregard for their welfare.  And the court ruled that termination of both parents' rights was in the children's best interest.  Because Mother proved that her failure to visit was not willful and her support under the circumstances was not "token," we reverse the termination of Mother's parental rights.  But the record contains clear and convincing evidence that Father abandoned the children by exhibiting wanton disregard for their welfare and that termination is in the children's best interests.  So we affirm the termination of Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part and Affirmed in Part**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and J. STEVEN STAFFORD, P.J., W.S., joined.

Tammy H. Womack, McMinnville, Tennessee, for the appellant, Jesse S.

Billy K. Tollison, McMinnville, Tennessee, for the appellant, Jazmine S.

Mary Little Pirtle and Quentin Scott Horton, McMinnville, Tennessee, for the appellees, Ellen W. and Tim W.

# OPINION

## I.

### A.

Jesse S. ("Father") and Jazmine S. ("Mother") gave temporary custody of their two children, Evella and Jesse Jr., to the maternal grandparents ("Grandparents") on June 13, 2018. A few weeks later, Grandparents filed a petition in juvenile court seeking temporary emergency custody of the children. In a sworn affidavit, they claimed that the children lacked proper food, nutrition, medical care, and housing and were exposed to methamphetamine while in the parents' care. They also disclosed that Father was evading arrest on drug charges.

On July 9, 2018, the Warren County Juvenile Court awarded Grandparents temporary custody of the children. The court also issued an ex parte restraining order, precluding the parents from "coming about the persons or places of the minor children including [Grandparents] pending further orders of the court."

While the juvenile court proceedings were ongoing, Grandparents filed a petition to terminate parental rights in the Warren County Chancery Court. But the court dismissed the petition on technical grounds.

Grandparents filed another petition to terminate on January 22, 2019. This petition alleged that both parents had abandoned the children by failing to visit or provide support for the children during the four months preceding the filing date. Father was incarcerated when the petition was filed. At the outset of trial, Grandparents announced that they intended to rely on abandonment by wanton disregard as an additional ground for terminating Father's parental rights. Father did not object.

After considering all the proof, the chancery court found that Grandparents had established, by clear and convincing evidence, grounds for terminating the parental rights of both parents. The court ruled that Mother had abandoned the children by willful failure to support or visit them for the four months preceding the filing of the termination petition. With respect to Father, the court ruled that he had abandoned the children by exhibiting wanton disregard for their welfare prior to his incarceration. The court also concluded that termination of parental rights was in the children's best interest.

### B.

At trial, Father admitted that he had been using illegal drugs "for a long time." And he avoided full-time employment, content to work the occasional "side job." Any income he earned was used to support his daily drug habit. When funds were short, he also sold

2

illegal drugs. A few months after Evella was born, Father sold methamphetamine to an undercover detective in front of the family's home. A short time later, Mother and Father abandoned the home and moved to Georgia for six months.

Grandparents were shocked at the horrid conditions they discovered when they visited the home a few weeks later. They had a friend take photographs. The entire residence was filthy. Unwashed dishes filled the kitchen sink. There was a dead rat on the floor. Cleaning supplies, antifreeze, and rat poison were unsecured. Cigarette butts and empty pill bottles littered the floor and the furniture. The bathroom sink was badly clogged. Numerous items, such as clothes and toiletries, were piled in the floor and on the bed.

The parents acknowledged that they may have left the home "a little bit dirty." But they denied that the photographs accurately depicted their living conditions with four-month-old Evella.

When the family returned from Georgia, their situation went from bad to worse. They either lived with Father's mother or in various hotel rooms. And Father began using intravenous drugs, mostly heroin. In May 2018, Father contracted a serious infection at his injection sites and was admitted to the hospital for nine days.

Mother asked Grandparents to take care of the children while Father was in the hospital. Evella was then twenty months old, and Jesse Jr., almost six months. When Grandmother arrived at the hotel, she found Evella in dirty, outgrown clothes. She had no shoes. Jesse appeared to have a cigarette burn on his arm. And the family had no food, formula, diapers, or wipes. Concerned about the children's living conditions, Grandmother contacted DCS.

A DCS investigator interviewed the parents shortly after Father was discharged. The investigator found no evidence of illegal drug use at that time. Both parents passed a urine drug screen. But she was concerned about the family's lack of food. On her return visit the next day, the family had acquired food for the children. So she took no further action.

At this same time, a grand jury issued an indictment against Father for selling methamphetamine. When the police officer came to execute the arrest warrant, he discovered Father needed ongoing medical treatment. So the officer gave Father a two-week reprieve.

To avoid arrest, Father fled to South Carolina, taking his family. Father later admitted that he made a bad decision. They left with $400 and whatever personal possessions they could fit in the car. They quickly ran out of money. As Mother explained, "[n]othing happened the way we wanted it to" in South Carolina.

3

Mother called Grandmother again, this time asking her to keep the children just "until I g[e]t on my feet." When Grandparents arrived, they found the children, hot, dirty, and hungry, sitting in the car. The parents had no diapers or wipes and only one jar of moldy baby food. According to Grandmother, the few clothes and baby equipment the parents provided were so filthy she had to throw them away.

Two days later, Grandmother took the children to Evella's former pediatrician, Dr. Amy Rogers. Evella had last been seen in early 2017 for her four-month visit. Now almost two, Evella was behind on her immunizations and showed signs of developmental delay. She spoke only a few words. She could not name colors or body parts. And she was unfamiliar with basic items, such as cups and spoons. As for Jesse, he had a severe diaper rash and needed multiple immunizations. He was also behind on his childhood milestones. He could not roll over and had problems using his legs.

Dr. Rogers recommended speech therapy for Evella and both occupational and physical therapy for Jesse. And she referred Jesse to several specialists for evaluation, including a urologist. Because the children were significantly delayed, they were also eligible for in-home therapy through Tennessee's early intervention services.

A few weeks later, Grandparents sought custody of the children in juvenile court. Grandmother told Mother about the juvenile court proceedings. But the parents did not immediately return to Tennessee. Mother claimed that they lacked money for the return trip. They were homeless and unemployed. While they made some money panhandling, Father used those funds to buy methamphetamine.

The parents were officially served with copies of the juvenile court's custody order on August 21. At that point, Mother realized that "there [was] nothing I could do for [the children] if I was out of state." When they returned in early September, Father was arrested. He remained in jail until his release on supervised probation on March 9, 2019.

With Father incarcerated, Mother concentrated on regaining custody of the children. Grandparents questioned her interest in the children, pointing out that between June 13, 2018, and January 22, 2019, Mother only visited the children once. And her visit lasted one hour.

Mother responded that she contacted Grandmother almost daily while she was in South Carolina. She continued to reach out after her return to Tennessee. But Grandparents denied her permission to visit. Grandmother even told her that "all this harassment has been turned into the authorities and reported to my lawyer. I will text you once a day on how the children are."

4

Grandmother acknowledged that Mother asked to see the children "a few times" in early September 2018. She explained that she denied Mother's initial visit requests after discovering that Mother had lied about Father's whereabouts.

According to Mother, after the text claiming harassment, she turned to the juvenile court for relief. She found a job and hired an attorney with her initial earnings. And in early November, her attorney moved to set visitation. Grandparents agreed to one visit provided that Mother passed a hair follicle drug test. Mother complied with their request. She maintained that her December 8 visit went well, and she was hopeful that the juvenile court would award more visitation at the upcoming hearing. But her efforts to visit her children were stymied when Grandparents filed their initial termination petition. The juvenile court continued her motion, pending the outcome of the termination proceeding.

With few available options, Mother sent two written visitation requests to Grandparents through her attorney—one on December 20 and one on January 14. But Grandparents only allowed her a telephone call. And she sent multiple text messages seeking updates on the children.

Grandparents also complained that Mother's child support payments were too little and too late. During the four months preceding the termination petition, she only sent two payments, each for $100.

Mother explained that she was unemployed until October 1, 2018. And she did not receive her first paycheck for three weeks. She used her initial earnings to hire an attorney and lease an apartment. But, beginning in December, she sent Grandparents $100 from each paycheck.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those circumstances in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2020).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are

shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). Statute defines "abandonment" in multiple ways. *Id.* § 36-1-102(1)(A) (Supp. 2020). The court concluded that Mother had abandoned the children under one definition and that Father had abandoned the children under a separate definition applicable to incarcerated parents.

1. Failure to Visit

Under the first definition, a parent is deemed to have abandoned a child when, "[f]or a period of four (4) consecutive months immediately preceding the filing of a [petition to terminate parental rights], the parent . . . either ha[s] failed to visit or ha[s] failed to support or ha[s] failed to make reasonable payments toward the support of the child." *Id.* § 36-1-102(1)(A)(i). Our primary focus is on Mother's conduct between September 22, 2018, and January 21, 2019, the day before the petition was filed. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014).

In concluding that Mother had abandoned her children by failure to visit, the trial court implicitly found that Mother's December 8 visit was token. *See* Tenn. Code Ann. § 36-1-102(1)(E) (defining "failed to visit" as including the failure to "engage in more than token visitation"). Token visits are "nothing more than perfunctory" or are so infrequent or short "as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(1)(C). Whether a visit is token "under the circumstances of the individual case" is a particularly fact-intensive inquiry. *See id.* § 36-1-102(1)(C); *In re Keri C.*, 384 S.W.3d 731, 748 (Tenn. Ct. App. 2010). We look at the "frequency, duration, and quality of the visits that occurred." *In re Keri C.*, 384 S.W.3d at 750. We also consider any evidence of "the parent's conduct and the relationship between the child and the parent up to this point." *Id.* at 749.

Mother does not claim that her visitation during the relevant period was more than token. Instead, she argues that her failure to visit was not willful.[1] As our supreme court has explained, "a parent who attempt[s] to visit and maintain relations with [her] child, but [i]s thwarted by the acts of others and circumstances beyond [her] control, [does] not willfully abandon [her] child." *In re Adoption of A.M.H.*, 215 S.W.3d at 810. The juvenile court's restraining order precluded Mother from "coming about" the children or Grandparents "pending further orders of the court." The order, issued on July 9, 2018, was never modified or rescinded. Mother risked court sanctions if she intentionally violated the order. So she reached out to Grandparents, who repeatedly denied her visit requests. And she actively pursued her legal remedies. Grandparents thwarted her juvenile court efforts as well by filing their initial termination petition.

Grandparents complain that Mother could have done more. We are not sure what that might have been, but Mother did enough to establish that her failure to visit was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I); *cf. In re Drako J.M.*, No. M2012-01404-COA-R3-PT, 2012 WL 6634335, at *8 (Tenn. Ct. App. Dec. 18, 2012) (holding failure to engage in more than token visitation was not willful when grandparents took action to limit mother's access to the children); *In re C.M.C.*, No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *6 (Tenn. Ct. App. Aug. 3, 2005) ("In light of the trial court's no contact order . . . , we can hardly agree that Mother willfully failed to visit her children . . . .").

2. Failure to Support

In concluding that Mother had abandoned her children by failure to support, the trial court explicitly found that Mother's two $100 payments during the relevant period were token. *See* Tenn. Code Ann. § 36-1-102(1)(D). Support is token if it is "insignificant given the parent's means." *Id.* § 36-1-102(1)(B). A parent's means includes "both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d

---

[1] Mother raised lack of willfulness as an affirmative defense in her answer. *See* Tenn. Code Ann. § 36-1-102(1)(I).

636, 641 (Tenn. 2013); *In re L.J.*, No. E2014-02042-COA-R3-PT, 2015 WL 5121111, at *6 (Tenn. Ct. App. Aug. 31, 2015) (noting that living expenses may be considered when analyzing a parent's means).

The evidence preponderates against the court's finding that Mother made only token support payments. According to her affidavit of income and expenses, Mother earned $800 biweekly. And most of that income was used to pay her monthly expenses, such as rent, utilities, transportation, and food. On cross-examination, Grandparents established some discrepancies in Mother's expense calculations. Still, Mother had only limited resources during the relevant time period. She was homeless and destitute in September. And her affidavit did not include some of the additional costs she incurred during that time period, such as the security deposit, utility hookups, and other fees outlined in her lease. Nor did it include the various items she needed to buy to establish her own household.

Again Grandparents complain that Mother could have done more. But Mother's payments during the relevant period were not insignificant given her limited means. *See In re Adoption of Alexander M.S.F.*, No. M2012-02706-COA-R3-PT, 2013 WL 4677886, at *6 (Tenn. Ct. App. Aug. 27, 2013) (finding father's payment of 1/3 the required amount not token under the circumstances). We conclude that the evidence is less than clear and convincing that Mother abandoned her children by failure to support.

3. Wanton Disregard

The court found Father had abandoned the children under a separate definition applicable to incarcerated parents. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). At the time this petition to terminate was filed,[2] the incarcerated or formerly incarcerated parent was deemed to have abandoned a child if he:

> either ha[d] failed to visit or ha[d] failed to support or ha[d] failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration, or [the parent] . . . ha[d] engaged in conduct prior to incarceration that exhibit[ed] a wanton disregard for the welfare of the child.

*Id.* § 36-1-102(1)(A)(iv)(*a*), (*c*).

The trial court focused on the second half of this definition of abandonment, finding that Father had "engaged in conduct prior to incarceration that clearly showed a wanton

---

[2] The Legislature amended this definition of "abandonment" in 2020. 2020 Tenn. Pub. Acts 43. We apply the version of the statute in effect at the time Grandparents filed this petition to terminate. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

disregard for the welfare of his children." Father argues that this ground for termination was never pled. And he lacked sufficient notice that his parental rights could be terminated on this basis.

### a.  Notice and Implied Consent

Parental rights can only be terminated on grounds that were alleged in the termination petition. *See In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Notice is "a fundamental component of due process." *In re W.B.*, M2004-00999-COA-R3-PT, 2005 WL 1021618, at *13 (Tenn. Ct. App. Apr. 29, 2005) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *State v. Pearson*, 858 S.W.2d 879, 884 (Tenn. 1993)). In the context of parental termination, due process requires that the parent be notified of the alleged grounds for termination. *In re Jeremiah N.*, No. E2016-00371-COA-R3-PT, 2017 WL 1655612, at *8 (Tenn. Ct. App. May 2, 2017).

We agree that this ground for termination was not pled. "Abandonment by wanton disregard is a distinct ground for termination of parental rights." *In re Johnny K.F.*, No. E2012-02700-COA-R3-PT, 2013 WL 4679269, at *7 (Tenn. Ct. App. Aug. 27, 2013). The termination petition alleged only that Father had abandoned the children by willful failure to visit or support them before the petition was filed. The petition never alleged that Father was incarcerated, much less that his pre-incarceration conduct evidenced wanton disregard for the children's welfare. *See In re Landon H.*, No. M2011-00737-COA-R3-PT, 2012 WL 113659, at *6 (Tenn. Ct. App. Jan. 11, 2012) (concluding that the petition failed to give father notice that his parental rights could be terminated based on his pre-incarceration conduct).

Even so, an unpled ground for termination may be tried by implied consent. *In re Adoption of Angela E.*, 402 S.W.3d at 640 n.3; *In re Alysia S.*, 460 S.W.3d 536, 564 (Tenn. Ct. App. 2014). We will find implied consent when a parent "knew or should reasonably have known of the evidence relating to the [unpled ground], did not object to this evidence, and was not prejudiced thereby." *Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 890 (Tenn. 1980).

We conclude that the ground of abandonment by wanton disregard was tried by implied consent. Father did not object when Grandparents announced that they were proceeding against Father on this ground. *See In re Anari E.*, No. M2020-01051-COA-R3-PT, 2021 WL 1828500, at *14 (Tenn. Ct. App. May 7, 2021) (finding implied consent when father did not object to petitioner's stated intent to proceed on unpled grounds); *In re Jeremiah N.*, 2017 WL 1655612, at *10 (finding unpled ground was tried by implied consent when father had notice "from at least the opening statement"). Nor did he voice any objections when Grandparents presented evidence in support of this ground. *See In re Allyson P.*, No. E2019-01606-COA-R3-PT, 2020 WL 3317318, at *9 (Tenn. Ct. App. June 17, 2020) (noting that "at no point during the trial did Mother object to any testimony or

other proof offered with respect to [the unpled ground]"). And Grandparents' proof consisted of much more than a simple account of Father's failure to visit or support the children. Father's belated objection during closing argument was simply too late. *See In re Adoption of E.N.R.*, 42 S.W.3d 26, 31-32 (Tenn. 2001).

b.       Evidence of Wanton Disregard

Having determined that abandonment by wanton disregard was tried by implied consent, we consider whether the evidence supports a finding of wanton disregard by Father. "Wanton disregard" is not a defined term. "[A]ctions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). "[P]robation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005).

Clear and convincing evidence supports the court's finding that Father's pre-incarceration conduct exhibited wanton disregard for the children's welfare. Father consistently placed his own welfare above that of his children. He exposed his children to illegal drugs. He sold methamphetamine out of the family's home when Evella was a baby. By the time he was incarcerated, he had been unemployed for over two years. Mother confessed that she did not know why Father chose not to work when he knew the family needed money. Any income he earned, legal or otherwise, went to feed his drug habit, not his children. According to Grandmother, he also traded the family's food stamps for cigarettes. *See In re Kandace D.*, No. E2017-00830-COA-R3-PT, 2018 WL 324452, at *4-5 (Tenn. Ct. App. Jan. 8, 2018) (concluding that father showed wanton disregard for his child by exposing the child to poor living conditions and malnutrition).

And, as a "textbook example of wanton disregard," Father prioritized his own freedom over the children's welfare when he took the family to South Carolina. *See In re Jaydin A.*, No. M2018-02145-COA-R3-PT, 2019 WL 6770494, at *4 (Tenn. Ct. App. Dec. 12, 2019) (finding wanton disregard in part because parent "put his desire to escape justice for his crimes ahead of his duty to parent his child"). He had no job, no housing, and barely enough money for food. In less than a week, the family was destitute. The children had nothing to eat but one jar of moldy food.

## B.

Because we agree that clear and convincing evidence supports at least one ground for termination of Father's parental rights to both children, we next consider whether

termination of Father's parental rights is in the children's best interests. Tenn. Code Ann. § 36-1-113(c)(2). Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interest analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682.

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005). Additionally, the analysis considers "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

After considering the statutory factors, the juvenile court determined that the termination of parental rights was in the children's best interest. Father takes issue with the trial court's analysis of factors one, three, four, five, six, and nine. We agree that the evidence preponderates against some of the trial court's findings. Still, we reach the same conclusion as the trial court.

The first statutory factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent." Tenn. Code Ann. § 36-1-113(i)(1). Father contends that the trial court ignored the recent changes in his life. Since Father was released from jail, he had secured employment, housing, and transportation. And as a condition of his probation, he attended Narcotics Anonymous meetings and submitted to regular drug screens. Father had made a significant adjustment. So factor one did favor Father.

The second factor considers the parent's potential for lasting change. *Id.* § 36-1-113(i)(2). Like the trial court, we are not convinced that Father had made a lasting change. Given his history, seven months was too short a time period to determine whether this change will last. This factor favors termination.

The third factor looks at whether the parent has maintained regular contact with the child. *See id.* § 36-1-113(i)(3). Father blamed Grandparents for his lack of contact with the children. But he never sent the children notes or cards while he was in jail. And he waited almost two weeks after his release to reach out to Grandparents. After a year without any contact, he had three one-hour visits. This factor favors termination.

11

The fourth factor addresses the quality of the parent's relationship with the child, whether it is "meaningful." *Id.* § 36-1-113(i)(4). The evidence does not preponderate against the trial court's finding that the children do not have a meaningful relationship with Father. Father relies on evidence of his previous relationship with the children. But any relationship Father might have had in the past is no longer evident. Evella calls Father "him" and describes him in negative terms. Jesse Jr. does not even know who he is. And while Father claims his visits with the children went well, Grandparents disagreed. Evella, in particular, has had a strong adverse reaction to Father's visits. The trial court evidently believed Grandparents. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) ("[F]indings with respect to credibility and the weight of the evidence . . . may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case."). We find no basis in this record to overturn that credibility finding. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

The evidence also does not preponderate against the court's finding that the fifth factor favors termination. This factor considers the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. Tenn. Code Ann. § 36-1-113(i)(5). The children have a strong bond with Grandparents. For over a year, Grandparents have provided them with a safe, stable home. The children have made tremendous strides in development. A change in caregivers would have an adverse impact on the children's emotional and psychological development.

The sixth factor asks whether the parent or a person residing with the parent "ha[d] shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household." *Id.* § 36-1-113(i)(6). The evidence does not preponderate against the trial court's finding that these children were neglected. Dr. Rogers, the children's pediatrician, opined that the children had been neglected to the point of abuse. Father questions Dr. Rogers's credibility. But even if we discount Dr. Rogers's testimony, we find abundant evidence in this record to support the court's neglect finding. The children lacked adequate food and supplies. They missed critical immunizations and medical examinations. As a result, the children needed multiple types of therapy to address significant areas of delayed development.

The seventh and eighth factors focus on the parent's ability to be a safe and stable caregiver. The seventh factor looks at the parent's home environment and whether the use of alcohol or other controlled substances would prevent the parent from properly caring for the child. *Id.* § 36-1-113(i)(7). The eighth factor evaluates whether the parent's mental or emotional status precludes proper parenting. *Id.* § 36-1-113(i)(8). There was no evidence that Father's current home environment is unsafe. And his recent drug screens have been negative. But Father has shown remarkably poor judgment as a parent. While he has expressed remorse for his past actions, this record lacks evidence that Father has the ability to parent these children.

12

The ninth factor examines the parents' child support history. *Id.* § 36-1-113(i)(9). Father concedes he did not made payments consistent with the child support guidelines. But he points out he began making payments as soon as he was financially able to do so.

Father's recent changes are commendable. But our focus is on what is best for the children. *In re Marr*, 194 S.W.3d at 499. The combined weight of the proven facts amounts to clear and convincing evidence that termination of Father's parental rights is in each child's best interest. For over a year, Grandparents have provided the children with food, medical care, and stability. The children are thriving in their current environment. They have no relationship with Father. Evella appears to be afraid of him. It would be detrimental to both children to remove them from the only stable home they have ever known.

### III.

Mother proved that her failure to visit her children during the four months preceding the filing of the petition to terminate parental rights was not willful. And her support of the children during the same period was not "token" given her means. So we reverse the termination of Mother's parental rights. But the record contains clear and convincing evidence that Father abandoned the children by exhibiting wanton disregard for their welfare. The record also contains clear and convincing evidence that termination of Father's parental rights is in the children's best interest. So we affirm the termination of Father's parental rights.

_____s/ W. Neal McBrayer_____
W. NEAL McBRAYER, JUDGE